## GENERAL ELECTRIC CO. v. PARAMET CHEMICAL CORPORATION.

### No. 229.

Circuit Court of Appeals, Second Circuit.

Feb. 10, 1936.

Charles Neave, Maxwell Barus, Merrell E. Clark, and Paul R. Ames, all of New York City, for appellant.

Gifford, Scull & Burgess, of New York City (George F. Scull and Joseph Hirschman, both of New York City, of counsel), for appellee.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

This suit is for infringement of the Kienle patent, No. 1,893,873 granted January 10, 1933, on an application filed January 29, 1927, for resinous condensation products and the process of making them. The object of the invention is to produce resins of the polyhydric alcohol-polybasic acid class which can be fully hardened or set at ordinary room temperature, that is, without baking and which shall have greater hardness and elasticity and more advantageous physical properties for industrial purposes than other previously produced and well-known alkyd resins. Alkyd resins were known to include the complexes resulting from the reaction of polyhydric alcohols and resinifying carboxylic organic acids such as the polybasic acids or their anhydrides.

In 1901, Watson Smith described a synthetic glycerol-phthalate resin made by the reaction of phthalic acid and glycerine. Arsem and Friedburg, in 1914, in their inventions combined Smith's glycerol-phthalate resin with different oily materials and particularly the acids of fatty oils. The patent in suit combined Smith's resin with a specific oily material known in the varnish art. Examples of the produce may be seen in the applications of Carleton Ellis' patent, No. 1,958,614, filed October 10, 1925; Weber, No. 1,690,515, filed October 13, 1925; and Hopkins and McDermott, No. 1,974,742, filed August 14, 1926.

But appellant says that Kienle made his discovery and reduced it to practice in 1921 and therefore antedates these applications. And, it argues, Kienle's invention lay in the discovery that an air drying resin—unheard of theretofore—could be made by using a particular kind of monobasic acid for the modifying acid.

When, in 1921, Kienle made his suggestion of a substitution of a monobasic acid for the modifying acid, the appellant, for whom Kienle worked, experimented with the substituted acid in its research laboratory but did not act to patent the process, and it is argued from this that this proposed substitution was not considered patentable in view of what the art knew of this resin and about varnishes in general.

Natural resins—as copals and rosin—are used to produce a finish on surfaces. They differ as to hardness, color, gloss, flexibility, water resistance, and ease of

application. Each of these resins had been selected by the varnish art where its particular qualities best suited the intended use. Spirit varnishes, as shellac, are solutions of the resin in some rapidly evaporating solvent such as alcohol—its film is that of the resin alone with its qualities of hardness and brilliance, but it is also quite brittle and not very adherent. An oil varnish is a combination of a resin with a fatty oil, as linseed oil. Since most resins cannot be directly incorporated into oil, when a new resin appeared, the problem of the varnish manufacturer was to combine it with oil. For incorporation in oil, some natural resins are cracked by heating; some esterified by heating with glycerine. Ester gums are so produced. Incorporating the resin in the oil obtains a finish film which partakes of the qualities of both the resin and the oil.

A most common varnish oil is linseed, an air-drying oil, and a thin coating of it, without resin, gradually hardens by oxidation in the air into a tough, elastic, impermeable, durable, and adherent film. Resin added to the oil gives a finish film with brilliance and hardness. The degree depends on the specific resin and the toughness, adherence, and speed of drying from the specific oil used and on the ratio of resin to oil. The harder and more brilliant the resin, the more of each quality is the film in general. The more rapidly a film of an oil alone will dry, the more rapidly will the varnish film made of that oil. So, therefore, as drying or nondrying varnish is desired, drying or nondrying oil is used.

The fatty oils involved here are glycerine esters or glycerides of monobasic acids. Esters are produced by the action of an organic acid on an organic base. In the fatty oils, the glycerine forms the base, and the fatty acids of the oil, the acid radicals. If the acid radical of the oil has less than two double bonds, the oil is called nondrying; if two or more double bonds, drying. Double bonds present in the acid radical part of the oil are important because the ability or inability to oxidize or dry in the air is a characteristic of the acid radical portion of the oil and not the glycerol radical or base portion. The characteristics carried into the glyceride or oil, when the acid reacts with glycerine to make the oil, correspond to those of the acid radical. Fatty acids alone will set but are not as film-forming as the oils. This is true both of the acids of the drying oils, as linseed, and acids of the nondrying oils, as oleic. It was known that fatty acids of drying oils as well as the more commonly used oils themselves could be used in varnish combinations. Hocker Patent, No. 1,422,861, December 11, 1919.

The problem of how to combine the Watson Smith resin with oily material, so that a film of such varnish would have the necessary flexibility and adherence without materially losing the hardness, brilliance, toughness, and heat irreversability inherent in that resin, was undertaken by Arsem (patents Nos. 1,098,776, 1,098,777) and Friedburg (patent No. 1,119,592). Smith had made his resin by reacting glycerine with a sufficient amount of phthalic acid to produce a saturated ester. Arsem and Friedburg each incorporated the oily material by substituting an equivalent molecular amount of a fatty acid for a part of the phthalic acid. The former used oleic acid (patent No. 1,098,777), and the latter butyric acid. In the Arsem patent, No. 1,098,776, he mentions other acids as examples of "various monobasic acids which could be used." Both these inventors explained the reaction as the combining of the dibasic phthalic acid with a trivalent alcohol (glycerine) so that "unattacked hydroxyl" or "free or unesterified hydroxyl" would remain and then the attaching of a monobasic acid to the glycerol radical at such "unattacked" or "free" hydroxyl to complete the esterification. This teaching would give the chemist an understanding that any other monobasic fatty acid could be hooked to the glycerol radical in the place of either of the two monobasic fatty acids mentioned by these patentees. A fellow chemist, Dawson, working with Kienle saw no reason, when the latter suggested it, why the monobasic fatty acids of linseed oil, a drying oil, could not be substituted for the nondrying monobasic oleic acid. While Arsem and Friedburg did not mention fatty acids of the drying oils, they apparently knew from their respective examples that any monobasic fatty acid could be used, for Arsem says, "equivalent amounts of various monobasic acids could be used," and Friedburg, in his claims, describes his new composition

of matter as one of glycerol and compounds of phthalic acid and a "monobasic aliphatic (fatty) acid."

The art had been taught that the characteristics of oil were carried into the Smith resin with the acids of oil. While not mentioning the acids of drying oil, some of the patented claims of these earlier inventions were broad enough to cover any fatty acids, whether of drying or nondrying oil. All that Kienle did in his "invention" was substitute a drying oil acid for the acids of nondrying oils specifically named by Arsem and Friedburg. Without experimentation both he and Dawson concluded from their experience and their knowledge of the prior art, that this substitution could be made and that it would probably give an air-drying product. These predictions of the result of such a substitution were as open to any skilled chemist as to Dawson and Kienle. And the substitution was made without a change in Arsem's procedure or preparation and without thought that any change was required. This mere substitution did not constitute an advance over the prior art sufficient to be protected by a patent. Nor is there anything in the record to negative the apparent simplicity of the idea. And there is no evidence that others sought and failed to produce this air-drying resin. The inactivity of the appellant in developing the process points toward the absence of any great demand for it. Although it had been suggested in 1921 that the substitution resin might be air drying, and this was in the report to the head of the research department, Kienle's and Dawson's notebooks between 1921 and 1927 show only occasional references to the substitution resin and the results. No tests of the air-drying possibilities were made. In 1927, when interest was aroused, none of the substitution resin was available and Kienle's experiments, then recorded in his notebook, show wrong proportions.

The Du Pont Company had independently substituted drying oil acids for the oleic acid of Arsem, and on August 14, 1926, had caused to be filed the Hopkins and McDermott application disclosing it —patent No. 1,974,742, that appellant caused Kienle to file the application for the patent in suit. The activity on the part of a number of workers in 1925 and 1926 was due to the marketing by Du Pont of its nitrocellulose lacquer, since resins compatible with cellulose esters were being sought for mixing with the Du Pont lacquers. Extension of these resins into the paint field followed. This has also occurred with the phenolic or bakelite resins. That the impetus came from the marketing of Duco is also shown by the Ellis patent, No. 1,958,614, where he disclosed the modified glycerol phthalate resin emphasizing tung wood oil as a modifying agent but giving a list of oils which may be used, including both drying and nondrying. In these patents as well as in Hopkins and McDermott and Weber, No. 1,690,515, the ability of resin to blend with cellulose material such as nitrocellulose is stressed. Weber said, "Nitrocellulose esters are not compatible with a great many substances," but that the resins produced by his present disclosures are "compatible in all proportions with these compounds, producing products of great toughness," and his claims are for a composition of matter which includes a cellulose ester and the resin.

While the fact, standing alone, that a number of chemists struck on the substitution independently of each other and independently of Kienle is not sufficient to disprove invention, under these circumstances it is sufficient to negative invention. Ruben Condenser Co. v. Aerovox Corp., 77 F.(2d) 266, 268 (C.C.A.2); Baker v. Hughes-Evans, 270 F. 97, 99 (C.C.A.2); Elliott & Co. v. Youngstown Car Mfg. Co., 181 F. 345, 349 (C.C.A.3).

Changed conditions in the varnish and paint trade did awaken a new interest in the alkyd resins as film forming materials. It is shown by these contemporaneous responses to a need that any skilled chemist, familiar with the natural-resin drying-oil blends of varnish, would have no difficulty when commercial operations called therefor, in ascertaining that synthetic resin could be combined with the ordinary drying oils to form the equivalent of the old combinations. It was not this patentee who turned the art to the use of an air drying glycerol phthalate resin.

There was no inventive thought in this substitution, and the patent is invalid.

Decree affirmed.